In the Matter of the Accounting of SIDNEY A. HOUCK, JR., as Executor and Trustee under the Will of PHILIP GROVE, Deceased, Respondent. BIRGIT B. GROVE, Respondent; BARBARA SIMONI et al., Appellants.

First Department, May 4, 1982

APPEARANCES OF COUNSEL

*William Tucker Dean* for Elizabeth G. Schweizer, appellant.

*Linda C. Lavery* of counsel (*Edward W. Lavery* with her on the brief; *Lavery & Lavery*, attorneys), for respondent.

*Stanley L. Kantor* of counsel (*Harvey Krauss* and *Kenneth Pearson* with him on the brief; *Snow, Becker, Kroll, Klaris & Krauss*, attorneys), for Barbara Simoni, appellant.

BLOOM, J.

These appeals present us with the nettlesome task of interpreting the Uniform Principal and Income Act (EPTL 11-2.1). Deceased, Philip Grove, married his first wife, Harriet Flaherty Grove, on July 17, 1926. By decree dated June 11, 1973 and entered in the office of the Clerk of Tioga County on that date, the marriage was dissolved because of the incurable insanity of Harriet for a period of more than five years (Domestic Relations Law, § 140, subd [f]).

Somewhat less than one year prior to the entry of the judgment of dissolution Philip executed his last will and testament. In it he provided for his then wife, Harriet, created a trust in the principal amount of $200,000 for the benefit of five designated relatives with remainder over to his three daughters by Harriet, Barbara Grove Simoni, Jane Grove Pritchard and Elizabeth Grove Schweizer, and to Birgit Bengston, in equal shares. He further directed that the rest, residue and remainder of his estate be divided into 20 equal parts. Three of those parts were left outright to each of his three daughters. He directed that the remaining 11 parts be held in trust for Birgit with remainder over to his four children by Harriet, the three daughters hitherto named, and a son, Winthrop D. Grove, in equal shares.

On July 14, 1973 Philip and Birgit were married. Five days prior thereto the two entered into an antenuptial agreement in which they acknowledged that title to the house and land theretofore owned by Philip and located at 112 East Genesee Street, Skaneateles, New York, had been transferred to Birgit on December 26, 1972. Additionally, Philip, by the agreement, made a gift to Birgit of all of the furniture, furnishings, equipment and improvements at the Skaneateles house and undertook to make Birgit the irrevocable beneficiary of specified life insurance policies having a combined value of approximately $200,000. In return Birgit agreed to waive any rights arising by operation of law in all realty and personalty owned by Philip.

During all of this period the primary asset of Philip was his major interest in three closely held corporations, Grove Shepherd Wilson & Kruge, Inc. (Grove, Shepherd); Grove Group, Inc., and MacLean Tunnel Corporation.

Harriet died on June 29, 1974. On July 27, 1975, Philip, then 70 years of age, was involved in an automobile accident. On August 16, 1975, as a result of the injuries received in that accident, he died. Birgit was 49 years old on the date of Philip's death. On that date Barbara Grove Simoni was 47, Jane Grove Pritchard was 46, Winthrop was 43 and Elizabeth Grove Schweizer was 34.

On April 25, 1977, some 20 months following the death of Philip, the liquidation of the three closely held corporations in which he was the principal actor was begun. Rather obviously, little or no income was derived from these corporations during the period of the winding down of their affairs. Moreover, for the five-year period antedating Philip's death all profits of the corporations had been ploughed back into the corporations to supply needed additional working capital. By consequence, no dividends had been paid during that period.

Following the death of Philip and continuing into 1976 Birgit received a small salary from Grove, Shepherd. The total for the two years aggregated $15,000. Additionally, and from the time of Philip's death through April, 1976, a period of some eight months, she continued to occupy, rent free, the co-operative apartment in the Sherry Netherland which she and Philip had occupied during the life of their marriage. Title to the apartment was in the name of the estate of Harriet Grove and the monthly maintenance charge of $2,000 was paid by Grove, Shepherd. From February, 1978 through January, 1980, her income from the trust exceeded $115,000. In 1977 and 1978 the income received by her from the estate of Philip Grove (as distinguished from the trust) totaled $20,568.89. Thus, her total income from the trust and the estate during this four-year period exceeded $135,000.

Inasmuch as there was a period during which a portion of the trust corpus was largely nonincome producing because of the liquidation of the three closely held corpora-

tions, the trustee brought this proceeding to settle his intermediate account and to determine whether an equitable apportionment between capital and income was appropriate. The learned Surrogate concluded that, under EPTL 11-2.1 (subd [k]), that portion of the trust corpus represented by the closely held corporations was underproductive property during the period of liquidation and that surrounding conditions and relationships prior to the date the trust became effective were not to be considered in determining the applicability of the doctrine of equitable apportionment. He held that some unspecified portion of the liquidating dividends was delayed income necessitating an apportionment of such dividends between capital and income. Two of the remaindermen, Simoni and Schweizer, appeal from that ruling.

The doctrine of equitable apportionment of underproductive trust property between life tenant and remaindermen has a long, if uncherished history. The applicable law with respect to apportionment of the proceeds of a trust between the life tenant and remaindermen has been set forth quite simply: "1. Ordinary dividends, regardless of the time when the surplus out of which they are payable was accumulated, should be paid to the life beneficiary of the trust. 2. Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund". (*Matter of Osborne,* 209 NY 450, 477.) To this an additional caveat was added: *"Third.* When a corporation is liquidated, its assets sold, and the proceeds distributed among its stockholders, an apportionment must be made between the capital of the trust fund and the income, and so much of the sum received by the trustee as represents profits accumulated since the creation of the trust must be attributed to income and paid to the life tenant; otherwise, there would

result an increase in the corpus of the fund by accumulations of income, which, except for the benefit of infants, is against public policy and expressly condemned by statute". (*Matter of Schaefer,* 178 App Div 117, 120-121, affd 222 NY 533; see, also, *Matter of Davis,* 54 Misc 2d 1065, 1070.)

The simplicity with which the rule was formulated is belied, however, by the difficulty encountered in its application (see, e.g., *Furniss v Cruikshank,* 230 NY 495; *Spencer v Spencer,* 219 NY 459; *Lawrence v Littlefield,* 215 NY 561). While these cases deal in the main with unproductive or underproductive realty, the same problems were encountered in dealing with personal property. Indeed, so grave were the problems encountered in dealing with specific fact situations that the rules were subjected to in-depth examination by the Temporary State Commission on the Modernization, Revision and Simplification of the Law of Estates* as part of the general revision of the law governing estates and practice and procedure relating thereto. As part of its report the commission recommended the adoption of the Uniform Principal and Income Act and noted that one of the purposes of that legislation would be "to remove the nightmare of apportionment of corporate distributions" (First Bennett Commission Report, NY Legis Doc, 1962, No. 19, p 267). That portion of the commission's recommendations which deals with the apportionment of principal and income of trust property is now to be found in EPTL article 11 (part 2). EPTL 11-2.1 (subd [e], par [6]) provides in part: "When a corporation or association is being wholly or partially liquidated, shares of stock and cash or other assets distributed to shareholders are principal, except that if the corporation or association indicates that some part of such distribution is a settlement of preferred or guaranteed dividends, that part of the distribution settling dividends accruing since the trustee became a shareholder is income".

On the other hand, EPTL 11-2.1 (subd [k], par [1]), which deals with underproductive property, provides, in pertinent part: "a portion of the net proceeds of any transaction

---

* The commission's reports commonly referred to as the "Bennett Commission Reports", derives its name from Nassau County Surrogate JOHN D. BENNETT, chairman of the commission.

with respect to any part of principal which consists of property, other than securities listed on a national securities exchange or traded in over the counter, which has not produced an average net income of one per cent per annum of its inventory value for more than one year (including as income the value of any beneficial use of the property by the income beneficiary) shall be treated as delayed income to which the income beneficiary is entitled as provided in this paragraph".

It is plain that the two provisions are compatible, i.e., that while the end result of the corporate liquidation process is capital under EPTL 11-2.1 (subd [e], par [6]), it also may be property which is underproductive during the period of liquidation under EPTL 11-2.1 (subd [k], par [1]). However, our inquiry does not end on that point. EPTL 11-2.1 (subd [a], par [1]) provides the rules by which the trust shall be administered. In the circumstances of this case we are of the opinion that the rule enunciated in EPTL 11-2.1 (subd [a], par [1], cl [C]) requiring administration of the trust "in accordance with what is reasonable and equitable in view of the interests of those entitled to income as well as those entitled to principal and in view of the manner in which men of ordinary prudence, discretion and judgment would act in the management of their own affairs" is the appropriate rule here to be applied. In so doing we must give due heed to the circumstances and relationships surrounding the execution of Philip's will. We must not lose sight of the fact that it is a trust created by Philip which we are required to construe. It is his intent which must be effectuated insofar as it can be ascertained from the instrument, the relationships and the surrounding circumstances. (*Furniss v Cruikshank,* 230 NY 495, *supra;* 61 NY Jur, Trusts, § 425.) These cannot be defeated by sterile rules.

These circumstances and relationship demonstrate that some six months prior to the marriage of Philip to Birgit, and obviously in anticipation thereof, Philip made a gift of the Skaneateles house and land. By the antenuptial agreement entered into five days before their marriage Philip transferred to Birgit ownership of all the furniture, furnishings, equipment and improvements at that house.

Additionally, he undertook to make her the irrevocable beneficiary of life insurance of the face value of $200,000. All of this followed the making of his will and was plainly part of a testamentary pattern. By his will Philip constituted Birgit as remainderman of one quarter of a $200,000 trust created for the benefit of relatives. Additionally, the trust of which Birgit was the life tenant was comprised of substantially more than the stock of three closely held corporations. This is evidenced by the substantial payments made to Birgit as life tenant. To this must be added the salary drawn by Birgit from Grove, Shepherd in 1975 and 1976 and her occupancy of the Sherry Netherland apartment, rent free, for a period of time. While there is nothing to show that Philip arranged for these two latter items, they could not have taken place without the consent of the trustee and remaindermen. It is a reasonable inference that, in so doing, they were following a wish, expressly or impliedly, indicated by Philip. Finally, Philip's will, the instrument by which the trust was created, expressly conferred upon the trustees the authority "[t]o continue to hold such shares and interest, if any, in Grove Shepherd Wilson & Kruge, Inc. * * * together with any shares or interests in any other corporation of which I may be a stockholder notwithstanding the fact that said shares or interest may constitute all or *the greater part of my estate or the trust or trusts in which they are held*" (emphasis supplied). This provision was included notwithstanding the fact that for five years prior to his death and for some two years prior to the execution of the will, the three closely held corporations had not paid any dividends.

Reading this will sympathetically and in its entirety in order to understand and give effect to the testator's intent (*Matter of Fabbri,* 2 NY2d 236) and interpreting it in light of Philip's acts, the instruments executed by him and the antenuptial agreement entered into with Birgit, we conclude that it was Philip's purpose that these closely held corporations or, if liquidated, the funds thereby represented, would at all times remain capital and would not be apportioned between capital and income.

Accordingly, the orders of the Surrogate's Court, New York County (MIDONICK, S.), entered June 30, 1981 are

reversed, on the law and the facts, and the objection of Birgit Bengston Grove seeking equitable apportionment should be dismissed, with costs to all parties filing briefs payable out of the trust estate.

SILVERMAN, J. (concurring). EPTL 11-2.1 (hereinafter the "Act") is the New York version of the revised Uniform Principal and Income Act adopted by this State after study by the Temporary State Commission on the Modernization, Revision and Simplification of the Law of Estates (hereinafter the "Commission").*

In the present case, the will did not say, either expressly or implicitly, whether any portion of the proceeds realized on liquidation of the corporations should be deemed income payable to the widow, or principal payable to the remaindermen. Thus we cannot say that "the terms of the trust instrument" answer the question. (EPTL 11-2.1, subd [a], par [1], cl [A].) In such circumstances, the Act requires that the allocation to income or principal or partly to each be made, "in the absence of any contrary terms of the trust instrument, in accordance with the provisions of this section" (EPTL 11-2.1, subd [a], par [1], cl [B]).

Unfortunately there is a question as to whether to apply subdivision (e) of the Act "Distributions of corporations or associations", or subdivision (k) "Underproductive property". Paragraph (6) of subdivision (e) provides in part: "(6) When a corporation or association is being wholly or partially liquidated, shares of stock and cash or other assets distributed to shareholders are principal, except that if the corporation or association indicates that some part of such distribution is a settlement of preferred or guaranteed dividends, that part of the distribution settling dividends accruing since the trustee became a shareholder is income." Subdivision (k), the underproductive property subdivision, provides in part: "(1) Except as otherwise provided in this paragraph, a portion of the net proceeds of any transaction with respect to any part of principal which

---

* When used hereafter "Second Report," "Third Report" and "Fifth Report" refer to the reports of the commission (or studies therein), respectively Legislative Document (1963), No. 19, Report No. 6.2B; Legislative Document (1964), No. 19, Report No. 6.3C; and Legislative Document (1966), No. 19.

consists of property, other than securities listed on a national securities exchange or traded in over the counter, which has not produced an average net income of one per cent per annum of its inventory value for more than a year (including as income the value of any beneficial use of the property by the income beneficiary) shall be treated as delayed income to which the income beneficiary is entitled as provided in this paragraph."

Applying paragraph (6) of subdivision (e) alone, it would be clear that the proceeds of liquidation of the closed corporation here involved constitute principal belonging to the remaindermen and not income payable to the widow. I do not think that subdivision (k), the underproductive property provision, is applicable to change this result for these reasons:

(a) Subdivision (e), "Distributions of corporations or associations", is a completely self-contained provision for the allocation of principal and income with respect to corporate distributions. Specifically with respect to liquidating dividends the purpose of the new rule was "to remove the nightmare of apportionment of corporate distributions" (Second Report, at p 267). It provides explicitly and precisely, with respect to proceeds of corporate liquidation, what belongs to principal and what belongs to income. In adopting this subdivision from the Uniform Principal and Income Act, the Commission did not lose sight of the problem of liquidations of closely held corporations. The Commission's study said: "It is believed that in the overwhelming majority of cases the rule above enunciated is sound. However, doubt has arisen as to the fairness of the rule, because of the New York cases previously discussed, in which it was found by the court that part of a distribution in liquidation represented earnings accrued since the acquisition of the stock by the trustee, which equitably belongs to income, and particularly with respect to liquidations or partial liquidations of closely held corporations. In the latter case, where those in control of the corporation are inimical to the income beneficiary, it would be possible for them to designate the entire distribution as a return of capital, thus depriving the income beneficiary of earnings accrued since the trustee's acquisition of the stock. It is felt

that such cases would involve fraud and might well be left to the courts to remedy, rather than to legislate for the unusual case." (Second Report, at pp 267-268.)

The corporate distribution provision was considered first and separately by the Commission (cf. Second Report, Report No. 6.2B ["Stock Distributions"], at p 182 *et seq.;* Third Report, Appendix L, at p 410 *et seq.,* and Report No. 6.3C, at p 421). In its later discussion of whether New York should adopt the revised Uniform Principal and Income Act, the Commission study said it was excluding any consideration of the problem involved in "corporate distributions which are the subject of a separate report." (Third Report, at p 421.) Indeed the genesis of the whole Uniform Principal and Income Act was the problem of corporate distributions. "But while considering this particular aspect of the rights of principal and income the Commissioners felt it desirable to extend their proposals so as to set forth convenient and workable rules of administration applicable to all aspects of the subject with the result that the original act covered all areas of possible conflict between the two interests." (Third Report, at p 421.)

The corporate distributions sections were separately enacted as section 17-a of the Personal Property Law (L 1963, ch 1005). The remainder of the Uniform Principal and Income Act was not enacted in New York until 1965 as article 2-A of the Personal Property Law (L 1965, ch 336). The statutory scheme for distributions of corporations or associations became section 27-e of the Personal Property Law and then for the first time the rest of the Uniform Principal and Income Act, including the underproductive property section (§ 27-k), was enacted.

(b) It is clear that under the revised Uniform Principal and Income Act, and all the Commission's recommendations relating to the adoption of versions of that Act in New York (until the final form of the Estates, Powers and Trusts Law), distributions on corporate liquidation were to be governed entirely by subdivision (e) "Distributions of corporations or associations", and not subdivision (k) or its predecessors relating to underproductive or unproductive property. For all the earlier versions of the underproduc-

tive property or unproductive property section of the Principal and Income Act applied only to a portion of the net proceeds of "sale". That is the provision of section 12 of the revised Uniform Principal and Income Act. It was the provision recommended by the Commission in the adoption of its version of the Uniform Principal and Income Act (Third Report, at p 417, referring to Personal Property Law, § 27-k). That is how the Legislature adopted the underproductive property provision as section 27-k of the Personal Property Law (L 1965, ch 336).

(c) When, however, the Uniform Principal and Income Act as embodied in sections 27-a through 27-q of the Personal Property Law was recast somewhat to become part of the Estates, Powers and Trusts Law, in the phrase as it now appears "any transaction" was substituted for "sale". Whatever that change may have meant, I do not think it was intended as a modification of the separate self-contained provisions with respect to corporate distributions. In its report recommending the adoption of the Estates, Powers and Trusts Law, the Commission stated the "highlights of the new law on an article by article basis". (Fifth Report, at p 46.) When it came to EPTL article 11, it listed the changes from the Principal and Income Act (Personal Property Law, §§ 27-a — 27-q). (Fifth Report, at p 58.) Nowhere does it even mention this change. The revisers' notes, after listing changes from sections 27-a through 27-q of the Personal Property Law without mentioning this change, say: "Changes in form are for clarification, and are keyed to the drafting pattern of the new law." (Revisers' Notes, McKinney's Cons Laws of NY, Book 17B, EPTL 11-2.1, at p 136.)

In his discussion of the Principal and Income Act embodied in the Estates, Powers and Trusts Law, Samuel Hoffman, one of the research counsel of the Commission, says that "[t]his section re-enacts, as revised, sections 27-a-q of the Personal Property Law". (Practice Commentary, McKinney's Cons Laws of NY, Book 17B, EPTL 11-2.1, at p 126.) And with respect to the underproductive property section, that "[t]his paragraph follows the rules for unproductive property embodied in section 12 of the revised Uniform Principal and Income Act." (*Id.,* at p

134.) As I have indicated, both the Personal Property Law provisions and the revised Uniform Principal and Income Act section as to underproductive or unproductive property applied only to "sales".

If the Commission had meant to make so drastic a substantive change as to have the underproductive property section override the corporate distributions section, the Commission would surely have mentioned that change.

(d) As between the corporate distributions subdivision (subd [e]), and the underproductive property subdivision (subd [k]), subdivision (e) should apply to distributions on corporate liquidation under the usual rule that as between two statutes, the more specific statute should override the more general one. Surely the provision of paragraph (6) of subdivision (e) "[w]hen a corporation * * * is being wholly or partially liquidated" is much more specific than the provision of subdivision (k) "any transaction". And in the liquidation provision, there is explicit provision as to what portion of the net proceeds constitutes principal and what portion constitutes income. That provision is different from the allocation between principal and income in the underproductive property subdivision. They cannot both be applied. And the corporate liquidation subdivision at least surely applies.

For these reasons I agree that the proceeds of liquidation of these closely held corporations belong to the persons entitled to the principal.

I would add that while we are concerned with "convenient and workable rules" (Third Report, at p 421) for allocation of income and principal, Justice BLOOM's analysis demonstrates that there is no injustice to the widow in the result reached.

CARRO, J. P., FEIN and MILONAS, JJ., concur with BLOOM, J.; SILVERMAN, J., concurs in an opinion.

Orders, Surrogate's Court, New York County, each entered on June 30, 1981, reversed, on the law and the facts, and the objection of Birgit Bengston Grove seeking equitable apportionment dismissed, with $75 costs and disburse-

ments to all parties filing briefs, payable out of the trust estate.