[798 NYS2d 615]

In the Matter of the Judicial Settlement of the Final Account of the CHASE MANHATTAN BANK (Successor by Merger to the CHASE MANHATTAN BANK, N.A., Successor by Merger to CHASE LINCOLN FIRST BANK, N.A., Successor in Interest to LINCOLN FIRST BANK, N.A., Successor by Consolidation to LINCOLN FIRST BANK OF ROCHESTER), as Trustee under the Agreement Dated December 20, 1973 of A. CHARLES PIOCH, for the Benefit of KATHLEEN M. PIOCH, Respondent. CATHERINE H. HYMAN et al., Respondents; ST. JOHN FISHER COLLEGE et al., Appellants.

Fourth Department, July 1, 2005

### APPEARANCES OF COUNSEL

*Harter, Secrest & Emery LLP*, Rochester (*A. Paul Britton* of counsel), for appellants.

*Woods Oviatt Gilman LLP*, Rochester (*Robert W. Croessmann* of counsel), for the Chase Manhattan Bank, respondent.

*Chamberlain D'amanda Oppenheimer & Greenfield LLP*, Rochester (*K. Wade Eaton* of counsel), for Arlene G. La Bounty and others, respondents.

*Wiedman, Vazzana, Corcorcan & Volta, P.C.*, Rochester (*James G. Vazzana* of counsel), for Frank B. Iacovangelo, respondent.

### OPINION OF THE COURT

KEHOE, J.

On this appeal, we are called upon to determine whether a trustee's classification of certain funds as income rather than principal of the trust, as well as the trustee's distribution of such funds in accordance with that classification, comport with the intent of the settlor of the trust. We conclude that they do.

At issue in this proceeding is the judicial settlement of the final account of petitioner, The Chase Manhattan Bank (Bank), as successor trustee of a lifetime trust (LTT) created by A. Charles Pioch (Charles) for his own benefit and, upon his death, for the benefit of Kathleen M. Pioch, his daughter. St. John Fisher College (College) and The Lutheran Church of the Incarnate Word (collectively, objectants), both of which are charitable remainder beneficiaries under the LTT, appeal from an order that, inter alia, dismissed their objections and those of the Attorney General on their behalf and granted the petition for judicial settlement of the final account of the LTT, thereby approving the fees and disbursements proposed by the Bank.

On appeal, objectants contend that Surrogate's Court erred in approving the Bank's characterization of certain annuity payments of $24,000 per year, paid from a separate charitable

remainder annuity trust (CRAT) into the LTT for the benefit of the income beneficiaries of the LTT, as income as opposed to principal. Objectants further contend that, even if the annuity payments received by the LTT from the CRAT were properly characterized by the Bank as income, the express terms of the LTT entitle objectants to those accumulated payments upon the death of Kathleen. We conclude that the court properly determined that the annuity payments constituted income to the LTT and that the Bank properly accounted for and distributed those payments. We thus conclude that the court properly dismissed the objections to the Bank's final trust account and approved that account.

The CRAT and the LTT, both of which were established in 1974, were the dual means by which Charles implemented his estate plan. Pursuant to that plan, Charles was to receive an income during his remaining lifetime, which turned out to be very brief, and the trusts thereafter were to provide for the financial needs of and pay an allowance to Kathleen during her remaining lifetime, which lasted another 25 years. Upon the death of Kathleen, whom the record describes as possessing a "limited mental capacity," the remainder of one trust was to be conferred upon the College, and the remainder of the other trust was to be conferred on both objectants. Charles created the CRAT with assets, mostly equities, then valued at $400,000. Charles directed that the trustee of the CRAT pay to the LTT "for the benefit of [Charles]" during his lifetime an "annuity amount" equal to 6% of the initial value of the assets deposited (i.e., $24,000 per year, to be paid quarterly). Upon Charles's death, the terms of the CRAT directed that such payments continue to be made to the LTT "for the benefit of [Kathleen], during her lifetime." The CRAT provided that the annuity payments to the LTT be paid from the net income of the CRAT and, to the extent necessary, from its principal, with any income in excess of 6% to be added to the principal of the CRAT. The remainder of the CRAT was payable to the College upon Kathleen's death.

The other trust created by Charles, and the focus of this proceeding and appeal, was the LTT, which initially was funded with about $121,000, mostly in cash, together with some stocks and savings bonds. The trustee of the LTT was directed to "hold, administer and distribute all of the aforesaid assets (together with all additions thereto and all reinvestments thereof) as the principal of a trust estate, for the benefit of [Charles during his

lifetime], in accordance with the terms and provisions hereinafter set out." The trustee of the LTT further was required to "pay or apply the net income to the use of [Charles] . . . during his life." Additionally, the trustee was authorized to invade and use principal as required for the support, maintenance, welfare and comfort of Charles. The LTT provided that, upon the death of Charles, if Kathleen survived him,

> "[the LTT] shall continue for the benefit of [Kathleen] and the Trustee shall apply the income *and so much of the principal* as in its discretion it shall deem necessary, for the support, maintenance and general welfare of [Kathleen], during her life. The Trustee shall pay, so far as possible, all specific bills for [Kathleen]'s living expenses, thus making certain that her rent, her utilities, her food, clothing and medical expenses are paid by the Trustee directly. [Kathleen] shall not be given any large sums of money, but only a small allowance by the Trustee every week to meet her personal needs" (emphasis added).

Upon Kathleen's death, the remainder of the LTT was to be allocated between objectants. This dispute is in essence between objectants and six blood relatives of Charles, Kathleen's heirs at law, who took by intestacy from Kathleen's estate, to which the Bank, in administering the LTT, distributed the accumulated annuity payments of $526,533.25.

Both the Bank and the court characterized the annuity payments as income to the LTT, and that characterization comports with the clear intent of Charles. Such intent is controlling on the issue of whether the annuity payments are principal or income in the hands of the Bank (*see* EPTL 11-2.1 [a] [1] [A]; *see also Matter of Andrews v Trustco Bank, N.A.*, 289 AD2d 910, 911-912 [2001]; *Matter of Grove*, 86 AD2d 302, 307 [1982], *appeal dismissed* 58 NY2d 689 [1982], citing *Furniss v Cruikshank*, 230 NY 495 [1921], *rearg denied and mot to* amend remittitur granted 231 NY 550 [1921]; *see generally Matter of Gilbert*, 39 NY2d 663, 666 [1976]; *Matter of McCabe*, 269 AD2d 727, 728 [2000]). Such intent is expressed in both trust instruments, which were executed on the same date and were to effectuate the same purpose, i.e., Charles's estate plan. Consequently, both trust instruments "must be read together as one" (*Nau v Vulcan Rail & Constr. Co.*, 286 NY 188, 197 [1941], *rearg denied* 287 NY 630 [1941]; *see Matter of Gagliardi*, 55 NY2d 109, 113-

115 [1982]; *Matter of Glaser*, 19 AD2d 354, 356 [1963], *affd* 14 NY2d 895 [1964]). Indeed, although objectants focus on the language of the LTT, it is the language of the CRAT, as the source of the annuity payments in question, that is primarily determinative of the issue of whether those monies are to be treated as income or principal.

Kathleen's beneficial interest under the CRAT, through the pass-through LTT, was as a beneficiary of the income of the CRAT and, if necessary, a portion of the principal of the CRAT to the extent of all of the $24,000 per year annuity payments required to be made by the CRAT to the LTT between May 20, 1975, when Charles died, and July 2, 2000, when Kathleen died. Moreover, the LTT required that all of its income be used for the benefit of Kathleen during her lifetime, making her the sole and unrestricted income beneficiary. The LTT further provided for the use of "so much of the principal as in its discretion [the trustee] shall deem necessary" for the benefit of Kathleen. The "so much of" language and the reference to Kathleen's needs applied only to principal and did not limit in any way Kathleen's entitlement to the income. Certainly, the ability of Kathleen personally to handle the income conferred upon her by the LTT was to be carefully circumscribed by the trustee, in accordance with the wishes of Charles. However, that does not alter the fact that Kathleen was the sole and unrestricted beneficiary of all income of the LTT, whether such income, including the annuity payments, was immediately used to support Kathleen or was accumulated for her benefit.

The CRAT further provided that the annuity payments made from the CRAT into the LTT would be for the benefit of the income beneficiaries of the LTT, i.e., Charles during his lifetime and thereafter Kathleen during her lifetime. The annuity payments thereby were intended to be income available for the support of Charles during his lifetime. Had Charles outlived Kathleen, he would not have been relegated to living off the income generated by the small portion of his estate that comprised the original LTT assets. The CRAT further required that the annuity payments accruing after Charles's death would continue to be made to the LTT for the benefit of Kathleen during her lifetime in the same manner as they had been made to the LTT for the benefit of Charles during his lifetime. There is no basis for deeming the annuity payments income to the LTT during Charles's lifetime but principal after Charles's death.

Read together, the two trust instruments thus embodied the intent of Charles that first he (and in all likelihood Kathleen as

well) and then Kathleen would live off of the income generated by both trusts, that the annuity payments would serve as a proxy for the actual income of the CRAT, and that such annuity payments would be characterized as the major part of the income of the LTT. Conversely, there is no expression of any intent by Charles that the annuity payments would benefit the remainder beneficiaries of the LTT. Had Charles intended such a result, it would have been a simple matter for him to specify that the annuity payments from the CRAT made after his death "be added to the principal of" the LTT and "be held, administered and distributed in accordance with the terms thereof."

The attendant financial circumstances bear out Charles's intent with respect to the annuity payments and support the Bank's characterization of those payments as income. Were we to agree with the position of objectants, we would have to conclude that Charles intended Kathleen to live off the income generated by the original $121,000 principal of the LTT only. If we assume an average return of 6% on the LTT assets, we would thereby have to conclude that the income of Kathleen in the year after her father's death would have been only $7,300 (whereas Charles and Kathleen together evidently would have had at least $31,000 to live on in the year preceding Charles's death). It is inconceivable that Charles, with an estate totaling $521,000, intended his only child to live on only the income generated by the $121,000 initially deposited into the LTT. In later years, deposits from the LTT into Kathleen's personal checking account alone (i.e., Kathleen's limited allowance) amounted to more than $22,000 per year, while Kathleen's rent was nearly $12,000 per year. Those two payments alone thus total more than $34,000 per year, a sum that does not even take into account taxes, insurance premiums, legal, medical and dental fees, and a host of other expenses of Kathleen that were paid directly by the trustee. We would have to infer that Charles seriously miscalculated Kathleen's financial needs if we were to conclude that he intended Kathleen to live off income from assets totaling less than 25% of his total estate. Such a result would be patently contrary to Charles's intent as expressed in the CRAT.

Objectants rely heavily on EPTL 11-2.1 (b) (2) as establishing that the annuity transfers from the CRAT to the LTT constitute principal, but we conclude that their reliance on that section is misplaced. First, it was the clearly expressed intent of Charles that annuity payments from the CRAT to the LTT be considered

income available for Kathleen's benefit (*see* EPTL 11-2.1 [a] [1] [A]). Second, EPTL 11-2.1 (b) (2) provides: "Principal is property, disposed of in trust, [the] income from which is payable to or to be accumulated for an income beneficiary and the title to which is ultimately to vest in the person entitled to the future estate." That definition makes clear that not all property disposed of in trust is principal. Rather, such property is to be considered principal only if it is property the "income from which is payable to or to be accumulated for an income beneficiary" (*id.*). That is not the case here. As previously set forth herein, the source of the "disposition in trust" is the CRAT, and thus the nature of that disposition (specifically, of the annuity payments) is controlled by the language of the CRAT, which specified that the annuity was to be paid to the LTT for the benefit of Charles during his lifetime and thereafter for the benefit of Kathleen during her lifetime. Reading both trust instruments together, it cannot be said that Charles's intent was that the $24,000 annuity should be used (i.e., invested as principal) only to generate some modest amounts of additional income that in turn would be used to support the lifetime beneficiaries (Charles and Kathleen and then Kathleen). Instead, the trust instruments, when read together, establish that it was the intent of Charles that the original principal of the CRAT would be invested and thereby generate income out of which the trustee of the CRAT was (by means of the directly or indirectly distributed annuity payments) to support those lifetime beneficiaries. Read together, both trust instruments thus provide that the annuity payments originated as income and thereafter retained their essential character as income.

Finally, in characterizing the accumulated annuity payments as income to the LTT and Kathleen and in distributing such funds to Kathleen's estate, the Bank has adhered to decisional law governing the accumulation of the income of a "needs trust" (*see e.g. Matter of Hesch*, 133 AD2d 994, 994-995 [1987]; *Matter of Hopkins*, 119 Misc 2d 218, 220 [1983]). The rule is that, "[w]here discretion is vested in the trustee to apply income, the retention of part of the income by him does not constitute a void accumulation" (*Hopkins*, 119 Misc 2d at 220). Pursuant to that rule, in the absence of language directing the distribution of accumulated income to the remainder beneficiaries, "[a]ny unexpended income remains the property of the income beneficiary (*Bloodgood v Lewis*, 209 NY 95[, *rearg denied* 209 NY 566]; *Hamilton v Drogo*, 241 NY 401; *Matter of Post*, 145 Misc

794)," and any income remaining "in the hands of the trustees continues to be property of the income beneficiary and at her death passes by will or intestacy (*Matter of Watson*, 262 NY 284; EPTL 11-2.1; *Matter of Outerbridge*, 91 Misc 2d 686)" (*id.*).

Accordingly, the order should be affirmed.

PIGOTT, JR., P.J. (dissenting). We respectfully dissent. In our view, the quarterly deposits from the charitable remainder annuity trust (CRAT) into the lifetime trust (LTT) between the time of the death of A. Charles Pioch (Charles), the settlor, and the death of Kathleen M. Pioch, his daughter, were additions to the principal of the LTT rather than income thereto.

In New York, the characterization of particular trust receipts as principal or income is subject to the "terms of the trust instrument" (EPTL 11-2.1 [a] [1] [A]). A trust instrument "is to be construed as written and the settlor's intention determined solely from the unambiguous language of the instrument itself" (*Mercury Bay Boating Club v San Diego Yacht Club*, 76 NY2d 256, 267 [1990]; *see Matter of Fabbri*, 2 NY2d 236, 239-240; *see also* EPTL 11-2.1 [a] [1] [A]). If the intent is ambiguous, the duty of Surrogate's Court is to effectuate the intent of the settlor, "insofar as it can be ascertained from the instrument, the relationships and the surrounding circumstances" (*Matter of Grove*, 86 AD2d 302, 307 [1982]).

Even assuming, arguendo, that the majority is correct that both trust instruments must be read together (*see Matter of Gagliardi*, 55 NY2d 109, 113-115 [1982]), we nevertheless conclude that the majority's analysis overlooks the following language in the LTT:

> "[T]he Grantor has this day delivered to the Trustee the property described in Schedule A, attached hereto, and *the Trustee agrees to hold, administer and distribute all of the aforesaid assets (together with all additions thereto and all reinvestments thereof) as the principal of a trust estate,* for the benefit of the Grantor, in accordance with the terms and provisions hereinafter set out" (emphasis added).

By those express terms, the "principal" of the LTT included "all of the aforesaid assets" and "all additions thereto." In our view, the LTT unambiguously sets forth the intent of Charles that the principal of the LTT include not only the initial assets deposited by him into the LTT but also the additional quarterly

deposits that he had directed to be made into the LTT from the CRAT (*see generally Mercury Bay Boating Club*, 76 NY2d at 267).

Even if we were to conclude that the language in the LTT is ambiguous, upon our review of the parties' relationships and the surrounding circumstances, we would conclude that the intent of Charles that Kathleen receive income from the LTT to cover her personal needs only is manifest (*see generally id.*; *Grove*, 86 AD2d at 307). Indeed, the LTT allocated no funds to Kathleen herself, but simply established a method by which the trustee could pay all of her living expenses and provide her with a modest weekly allowance. We can discern no intent expressed in the LTT that Kathleen ever have control over or the power to alienate those funds, nor is there any evidence of such intent in the dealings between Charles and his attorney. The record before us establishes that Charles told his attorney at the time the trusts were established that, after Kathleen's death, he wished the remaining trust assets to pass to the objectant elee-mosynary institutions. According to the affidavit of Charles's attorney, Charles never indicated that he wanted anyone other than his daughter and the objectants to be the beneficiaries of his estate and trusts.

Our conclusion is buttressed by the EPTL, pursuant to which assets deposited into a trust are principal. EPTL 11-2.1 (b) (2) provides that "[p]rincipal is property, disposed of in trust, in income from which is payable to or to be accumulated for an income beneficiary and the title to which is ultimately to vest in the person entitled to the future estate." EPTL 11-2.1 (b) (1) provides that "[i]ncome is the return in money or property derived from the use of principal." We agree with objectants that a plain reading of those paragraphs qualifies the funds at issue as "principal" because such funds were "disposed of in trust." Moreover, once the funds were deposited into the LTT, the income from the assets was "payable to . . . an income beneficiary," i.e., Kathleen (EPTL 11-2.1 [b] [2]), and title ultimately was to pass to the entities entitled to the future estate, i.e., objectants. Finally, in our view it is patently clear that the quarterly deposits from the CRAT into the LTT were not "income" because such funds did not represent any kind of "return in money or property derived from the use of principal" (EPTL 11-2.1 [b] [1]). Rather, the $6,000 quarterly payments derived from a source external to the LTT, i.e., the CRAT.

Accordingly, we would reverse the order, sustain the objections and remit the matter to Surrogate's Court for further proceedings consistent with our dissenting opinion.

MARTOCHE and HAYES, JJ., concur with KEHOE, J.; PIGOTT, Jr., P.J., dissents and votes to reverse in accordance in a separate opinion in which GREEN, J., concurs.

It is hereby ordered that the order so appealed from be and the same hereby is affirmed without costs.